## SHROEDER *v.* GEORGIA RAILWAY & ELECTRIC CO.

The court did not err in granting a nonsuit.

JULY 24, 1914.

Action for damages. Before Judge Bell. Fulton superior court. January 10, 1913.

Mrs. H. M. Shroeder sued the railway company on account of

personal injuries sustained by her by reason of one of the defendant's cars running against her. On the trial, at the conclusion of the evidence introduced by the plaintiff, the court awarded a nonsuit; and to this ruling the plaintiff excepted. The circumstances under which the plaintiff's injuries were received will appear from the following extracts from her testimony. "I now live at 330 Highland Avenue, Atlanta, and on the 14th day of December, 1911, lived at the same place. I had lived there prior to the 14th of December four years. On that morning my husband and I had occasion to come to town on the car, and undertook to board one of the defendant's cars at the half-way stopping-place between Alaska and Sampson streets, called the Phœnix stop, that is half way between Alaska Avenue and Sampson street. The Phœnix Planing Mill office is directly across. The street-car track there is double track and was double at that time. It was about eight o'clock in the morning. It was not a crossing; it was a stopping-place. A sign, 'Cars stop here,' was on a board nailed to a pole. It had been a stopping-place about six months, I suppose. I had occasion to board the car, prior to that time, at that point. I had always caught the car there after they had a stopping-place there. I boarded the car at that point prior to that about once a week. We were going to do Christmas shopping, my husband and I, and we came out (we live on an elevated lot) and we went across on the opposite side and stopped at Stocks' coal-yard. From there we saw the car coming over the bridge, and we ran out of the office and half way up on the sidewalk, and then ran out into the street, and as I ran out into the street I threw up my hands to signal the motorman. I then ran on almost to the stopping-place. I looked back, and I thought the motorman was stopping for me. I ran on just a few feet or so, just about the place they stop, and as I threw my foot on the track the car struck me. It was necessary for me, in order to board the car, to be on the north side of the track, and we were on the south side. . . The bridge over the steam railroad tracks is about five hundred feet from the stopping-place. From the office of the Stocks Coal Company to where we were going to take the car is about eighty to a hundred feet. When I first saw the car it was coming over the bridge. I ran a little faster than a walk. My husband was with me on the left-hand side of me. Just before I got to the point where I started over to get ready to board the car, I looked to

see where the car was. It was then about fifty feet away, I judge. When it was crossing the bridge when I first saw it coming, I don't know whether it was running fast or slow. I thought it was running fast when I stepped off the sidewalk. When I looked back, just before crossing over, I was under the impression it was stopping. The motorman did not give me any signal at all, or ring the bell before the car struck me. The car struck me on the right side of my body. I don't know how it hit me, but I was thrown around, and I felt myself going down by the side of the car, and my head struck. The part of my body struck by the car I think was my limb below the knee. Below my knee on the right side there was a big knot as large as my fist for a month. . . Stocks' office is directly across from our home. My husband and I had gone across to Stocks' office that morning, and had been in there just a few minutes. We were looking down there for the street-car. We went in there for that purpose and because it was cold, and it was warm in there; waited in there, instead of in the street. We did not wait in our house. We were on an elevated lot, and you can stand in the office door there and see the car as it comes over the bridge, and you can not from our piazza. Our house was back from the street about 15 feet, I suppose. We could have time to get from there up to the stopping-place and catch a car coming in, but we had gone over to Stocks' to wait for the car. That was on the opposite side of the street from where you had to get on the car. . . The car coming in towards town was on the side of the street next to our house and the side of the street away from Stocks' office. We were still in Stocks' office when we saw the car coming; we were standing in the door inside where it was warm. When I first saw the car I thought it was coming fast. When I was in the door it was about four hundred feet from that place, as I estimated it, down to the bridge. . . I didn't think about the speed of the car; I just thought it was going fast. I didn't try to make an estimate of the speed of the car. I couldn't well estimate the speed of the car. I know it was going faster than it usually does. I can not give the jury an estimate of how fast it was going at that time. I saw it coming, and after my husband went out I followed him. We went out then on the sidewalk next to Stocks' store. . . I was next to the street on the left-hand side of the street coming up towards town. We ran up the sidewalk faster than you can walk.

We ran a medium gait. I heard the car coming when I was running. I knew it was coming during all of the time. My husband and I were running a medium run, running along the sidewalk together, he a little in advance. . . We ran up there on that sidewalk about half way, about fifty feet. When I left the sidewalk I threw up my hands and signaled the motorman. Then I had run about half way to the stopping-place, about fifty feet on the sidewalk—that is before I stepped off the curbing into the street, and then I looked back to see the car. I couldn't tell how fast the car was running just now, and I couldn't tell how fast the car was running then. Up to this time, when I looked back, that is the first time I had undertaken to give any signal. When I stepped off the curbing into the street and looked around and still saw the car coming, . . when I stepped off the curbing into the street, the car was about two hundred feet off. I could not say whether the car was going faster or slower than when I first saw it at that time. There are two tracks there. The car track of the car coming to town was on the right-hand side of the street, and there is a distance between the car track and the curbing for a wagon to stand. . . I was not running on the track the car was on, but on the other car track. I was on the left of the way the car was coming. I was near the left-hand rail of the other car track. I heard the car coming during all the time I was running those fifty feet. . . From the time I had stepped into the street and ran up that distance, hearing the car coming, I hadn't looked back at the car. . . I couldn't tell how far the car went after it had struck me. . . After running up that other fifty feet on this left-hand rail of the other street-car track, I then started to go towards the car track that the car was on. Just as I was about to step on the rail, or near the rail of the car track nearest to me, the car hit me right on my right foot up there. I was still running at that time. Now, when I turned from towards this other car track and turned to the right to run, just as I put my foot over and was putting it down near the left-hand rail of the car track that the car was on, the car hit me—the front left-hand corner of it hit me below the knee. I didn't stop running from the time we started from Stocks' coal-yard until the time the car hit me; I only looked back. I didn't stop still then. One time I looked back—the first time was when I had run along about fifty feet on the sidewalk and I was still running. Then I came into the

street on to the left-hand rail of the other car track and ran about fifty feet more; knowing that during that time the car was coming and hearing it coming, I did not stop running. I looked back five or six feet before I started to step over the track. Five or six feet then before I started from the other car track across, I looked back again; I was still running. Then I ran on up five or six feet further before I started across. When I looked back I thought the car was stopping. Then I ran, before I turned to go across, five or six feet further. I went diagonally towards and closer to the other track where the car was. . . Just as I got there and started to step, still running, the left-hand front part of the car came in contact with me, some part of my leg, just as I made the step. The car must have been coming a little bit faster than I thought it was. I half walked and was half carried to my home. There was a person on either side of me. Just as I made the step, just as I was hit, my husband hollered at me. He said 'Look out!' . That was just as I was struck. . . No obstruction whatever was between me and that motorman when I gave him the first signal that I wanted the car to stop for us to get on. When I looked back the second time, after I had left the sidewalk, running up to the place to board the car, nothing was between me and the motorman. When I looked back at the car, the motorman was on the front of the car and looking ahead. When I left that left-hand track, crossing over after going fifty feet, I left it diagonally when I was crossing over to catch the car. I went diagonally from the sidewalk going that way. I mean diagonally all the way. There was a board at the half-way stop. It was on the telephone pole on the left-hand side. I never did get quite even with that board. I never had quite gotten up as near towards town as the board was. I missed getting up towards town where the board was before the car hit me. I was a shorter distance than a car-length from the board, I suppose about as far as from here to that end of that," indicating end of railing in front of the jury-box. The remainder of the plaintiff's testimony related to the character and extent of her injuries and the pain caused thereby.

The plaintiff put in evidence an ordinance of the City of Atlanta, prohibiting the running of street-cars at such places as that where she was injured at a speed more than fifteen miles per hour. The testimony of her husband was in substantial accordance with hers. The following extracts are from his testimony: "When I first saw

12

the car it was coming over the Southern Railroad bridge, nearly 500 feet off. When I saw it crossing the bridge, I presume it was running fifteen or sixteen miles an hour. When we saw the car we immediately attempted to get up to this half-way stop, in front of the Phœnix Planing Mill. We left the office immediately upon seeing the car coming across the bridge. From Stocks' office to this point where we board this car is about 100 feet. We went towards town at rather a rapid gait. Went up the sidewalk a part of the way. We went at a gait fast enough to catch the car. We were moving in a right rapid walk up there towards that half-way stop. . . After leaving the curbing we ran into the middle of the track and went right up the two tracks. There are two tracks there that turn parallel, and we ran between the two tracks. . . When we went across the track, we were right at the stopping-place. Then the car struck my wife. She had undertaken to go across. She was crossing right square across the track. . . I saw the car just as it struck her and hollered 'Look out,' just as the car hit her. I think the car struck her ankle and probably her hip. She had bruises on her ankle and her hip. The car dragged her, I suppose, two or three feet. The car went between fifty and seventy-five feet, before the motorman stopped it. He gave us absolutely no signal, that I heard, as he approached. I was in a position to have heard, had it been given. When the car struck my wife I should presume it was going at least twenty miles an hour. When I saw it coming over the bridge I suppose it was going twelve to fifteen miles an hour, or something like that. I did not look at the car from that time until I looked at it just before it hit my wife. I went up towards the crossing as soon as I saw it start across the bridge. There was no obstruction between the motorman, if he had been looking ahead, to prevent him seeing that we were going to take the car. . . Our house is on the right-hand side of Highland Avenue coming into town. On this morning we went over to Stocks' Coal Company and waited there until we saw the car coming. We did this because it was cold and we could get a better view of the car over there on the south side. . . I saw the car coming, and, in my opinion, it was coming about sixteen miles an hour when I saw it. I estimate that it was about four hundred feet away. . . There was nothing back there to keep us from seeing the car coming up. We could see the car very easily by looking back. We walked up on the sidewalk, I suppose, about forty

or fifty feet. Neither of us was running during the time rapidly, not in a dead run. We were going faster than an ordinary pace for an ordinary walk. . . When I went that forty or fifty feet I didn't look back at all. I knew the car was coming, for I had seen it coming and heard it coming. When I got out in the street I didn't look back to see if it was coming. I didn't look back to see how fast it was coming, or how close it was. . . We could not take the car on the side we were on, as we were to the left of its car track. During the time we were left on its car track, I didn't look back to see how fast the car was coming or how close it was. . . As soon as she turned directly and took one step over that way the car came in contact with her. . . I am familiar with the speed of cars from riding on them. That car before it struck my wife was going at least twenty miles an hour. I did not see the motorman apply his brakes. . . As I started across I could easily, or my wife could have easily, looked around to see where the car was. There was no obstruction to keep me from it. . . When I turned around and saw the car, and my wife turned, the car was right there and hit my wife; it was instantaneous. I did not attempt to estimate the exact speed of that car, but the car was running faster than it had been before, or she would have had time to get back off the track. After the car had hit my wife and knocked her down, it stopped some fifty or sixty feet away." There was testimony of a physician, and of another witness, as to the character and extent of the plaintiff's injuries.

*Brown & Randolph, Parker & Scott,* and *Westmoreland Brothers,* for plaintiff. *Colquitt & Conyers,* for defendant.

FISH, C. J. (After stating the foregoing facts.) There was evidence which would authorize the jury to find that the defendant company was negligent at the time plaintiff was injured; and the question here for determination is whether, notwithstanding the defendant's negligence, the plaintiff was guilty of such negligence as to preclude a recovery. As appears from the evidence for the plaintiff, she and her husband at the time they first saw the car which they desired to board were not at the regular stopping-place or on the north side of the street, where they should have been in order to signal and take the car, but were on the south side of the street about 100 feet away from the stopping-place. After they saw the car coming rapidly over the bridge, plaintiff and her husband

started up the street on the south or left-hand side towards the stopping-place. After going on the sidewalk about 50 feet towards the stopping-place, they stepped off into the street and plaintiff then threw up her hand as a signal for the motorman to stop, at the time looking towards the car and seeing that it was rapidly approaching. She continued on towards the stopping-place, not on the track that the car was on, but on the other track or between the tracks and in a place of safety. From the time plaintiff left the office of the Stocks Coal Company to the time when she was hit by the car, she knew that it was coming. She had seen it as she left the office, and when within some 50 feet of the crossing she turned and saw it again, and during the whole time knew that it was rapidly approaching the crossing, though, she testified, when she looked back just before reaching the crossing she "was under the impression it was stopping." The car was then some 50 feet from her, and she had some five or six feet further to go before reaching the point for the car to stop. Without looking again to see how far the car was away or to ascertain its speed, she turned just as the car reached her and attempted to cross the track in front of it; and· as she made the first step towards crossing the track that the car was on, it struck her. In *Atlanta Railway & Power Co.* v. *Owens,* 119 *Ga.* 833 (47 S. E. 213), Justice Cobb, speaking for the court, said: "The case presented shows that at the time she [the plaintiff] drove upon the track she knew the car was approaching, both from the noise and the light, though her view of the track was obstructed by the wagon. Under such circumstances, any prudent person would have taken some precaution to ascertain how near the car was from the point where the attempt to cross was to be made; and to attempt to cross under the circumstances indicated by the plaintiff's testimony, where she had full knowledge that the car was approaching and did not know how near or how far it was, or at what rate of speed it was running, was such an act of negligence on her part as would preclude a recovery by her. She should at least have taken the precaution to ascertain how near the car was, before attempting to cross the track, when she was on notice, both by the noise and the light of the car, that it was approaching. This seems to be a case where the plaintiff, knowing the danger, deliberately took the risk of being able to cross before the car could reach the point where she intended to cross, and made an error of judgment

as to the time that would elapse before the crossing could be made or before the car could reach that point. Such an attempt, under such circumstances, was an act of gross negligence on her part, and evidenced such a lack of prudence as to entirely defeat a recovery by her. . . The plaintiff having, in our opinion, failed to take such precautions for her safety as, under the circumstances, an ordinarily prudent person would have taken, she would not be entitled to recover, notwithstanding the car may have been run at an unlawful rate of speed at the time of the collision." This language is quite appropriate to the case at bar under its facts. We are of the opinion that the trial judge properly awarded a nonsuit.

Counsel for plaintiff in error cited the case of *Harrison* v. *Georgia Ry. &c. Co.*, 134 *Ga.* 718 (68 S. E. 505). The facts in that case were stronger for the plaintiff than those in the present case are for the plaintiff here. It did not appear in the *Harrison* case that Mrs. Harrison, who was killed by the running of a street-car, actually saw the rapidly approaching car; she had on a sunbonnet which may have prevented her from seeing the car. It did appear that her son, who was approaching the crossing where they expected to board the car, was ahead of her, and that he crossed the track and was at the place where it was customary to signal the car to stop, and did so signal it. He was in view of his mother, who was directly approaching him, and the inference could easily have been drawn by the jury that she had the right to assume that the car would be stopped in response to his signal; and this court thought the case should go to the jury. The rule followed in the *Owens* case was clearly recognized in the *Harrison* case. Another case relied on by counsel for plaintiff in error is that of *Howard* v. *Savannah Electric Co.*, 140 *Ga.* 482 (79 S. E. 112), where the direction of a verdict for the defendant was reversed by this court. In the opinion in that case it was said that "the petition did not allege, nor did the evidence show, that the deceased ever saw the approaching car before he stepped upon the track where he was struck." In that case it did not appear that the plaintiff knew of the approaching car which struck him or had any knowledge that any danger was imminent when he undertook to cross the track of the defendant company. The case at bar is also distinguishable from that of *Columbus Railroad Co.* v. *Asbell*, 133 *Ga.* 573 (66 S. E. 902). In that case it did not appear that the person run over by a street-car

knew of the approach of the car which struck him. There was no evidence that he saw or heard it. He had just alighted from one car of the defendant company; and though he undertook to see if a car was approaching, he could not do so on account of a shadow produced by an electric street light, and there was evidence that the rumbling noise of the car from which he alighted prevented him from hearing the approaching car.

*Judgment affirmed. All the Justices concur.*